IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT

OF TENNESSEE

**Ashley Bianca Ruth Kroese,**

*Plaintiff,*

v.

**Trooper Matthew Priest, Trooper Ryan Nieuwenhuis, ADA Jamie Pulido, District Attorney Kim Helper, Nurse Allie Osborne, Nurse "Chandler" (full name unknown), Nurse "Linda" (Williamson County Jail), John/Jane Doe Vanderbilt Hospital Staff (Legal and Lab Personnel), John/Jane Doe Williamson County Jail Officers and Medical Staff, and Judge Tom Taylor, Jr.**

*Defendants.*

Case No #
3:25-cv-1268
MB

---

## ATTACHMENT TO COMPLAINT FOR VIOLATION OF CONSTITUTIONAL

### RIGHTS PURSUANT TO 42 U.S.C. § 1983

---

### INTRODUCTION

1.      This is a civil rights action brought under 42 U.S.C. § 1983 to redress constitutional violations suffered by Plaintiff Ashley Kroese during her hospitalization and custodial detention following a serious automobile accident on June 18, 2020. While recovering at Vanderbilt University Medical Center ("VUMC") and later held as a pretrial detainee at the Williamson County Jail, Plaintiff was subjected to violations of her Fourth and Fourteenth Amendment rights, including unlawful or excessive search procedures, deliberate indifference to serious medical needs, punitive and inhumane conditions of confinement, and other misconduct.

1

Plaintiff does not, through this action, seek to challenge the validity of her conviction or sentence. Rather, she brings this action to address the unlawful conduct of officials and staff during her pretrial detention and hospitalization while under the care and supervision of Williamson County authorities from June 20, 2020 through July 7, 2020, and again from February 18, 2022 through May 6, 2022. Plaintiff seeks compensatory and punitive damages, as well as declaratory and injunctive relief to prevent recurrence of these constitutional violations.

2.     **Jurisdiction and Venue:** This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as the claims arise under the Constitution and laws of the United States, including 42 U.S.C. § 1983. Venue is proper in the Middle District of Tennessee under 28 U.S.C. § 1391(b), as the events giving rise to these claims occurred in this district—specifically in Davidson County (at Vanderbilt University Medical Center) and Williamson County (at the Williamson County Jail). All Defendants were acting under color of Tennessee state law and performed the acts complained of within this judicial district.

3.     **Parties:**

➤     **Plaintiff Ashley Bianca Ruth Kroese** is a 24-year-old resident of Thompson's Station, Tennessee. At all relevant times, she was either in the custody or under the authority of Tennessee state officials. She sustained multiple serious injuries in a motor vehicle accident on June 18, 2020, and was held as a pretrial detainee from June 20, 2020 through July 7, 2020, and again from February 18, 2022 through May 6, 2022.

➤     **Defendant Trooper Matthew Priest** is, on information and belief, a Tennessee Highway Patrol ("THP") Trooper who participated in the investigation of the June 18, 2020 automobile crash. Trooper Priest was present at Vanderbilt University Medical Center during Plaintiff's hospitalization and engaged in investigatory activity while Plaintiff was under medical

care. He is sued in his official and individual capacity for actions taken under color of state law, including violations of Plaintiff's constitutional rights in connection with her custodial status and medical vulnerability.

➢ **Defendant Trooper Ryan Nieuwenhuis** is a Tennessee Highway Patrol Trooper who obtained a search warrant for Plaintiff's blood on June 18, 2020, and retrieved blood specimens from Vanderbilt University Medical Center. He is sued in his official and individual capacity for actions under color of state law, including conduct that violated Plaintiff's Fourth Amendment rights in the execution and handling of evidence, regardless of whether such evidence was later used at trial.

➢ **Defendant Jamie Pulido** was an Assistant District Attorney ("ADA") for Williamson County (21st Judicial District) who was present at the scene of the June 18, 2020 incident and was involved in investigative decisions during the early stages of Plaintiff's detention. He is sued in his official and individual capacity for actions taken in an investigative (not advocative) capacity under color of state law, including participation in or direction of law enforcement activity that violated Plaintiff's constitutional rights.

➢ **Defendant Kim Helper** was at all relevant times the District Attorney for Williamson County. She is sued in her official and individual capacity for actions taken under color of state law that were administrative or supervisory in nature, including her involvement in detention decisions, bond advocacy, and alleged retaliatory actions that affected Plaintiff's conditions of confinement and treatment by jail personnel, separate from any courtroom advocacy or prosecution.

➢ **Defendant Allie Osborne** is a nurse employed by Vanderbilt University Medical Center ("VUMC") who attended to Plaintiff during her post-accident hospitalization. Nurse Osborne is

3

sued in her official individual capacity for acts taken under color of state law, specifically for alleged participation in joint activity with law enforcement that resulted in the denial of Plaintiff's medical rights and privacy protections during her hospitalization.

➤ **Defendant "Chandler"** (full name unknown) is a nurse referenced in Plaintiff's medical records as having participated in Plaintiff's care at VUMC. She is sued in her official and individual capacity under color of state law for alleged participation in joint activity with law enforcement that violated Plaintiff's constitutional rights related to medical care and patient privacy.

➤ **Defendant "Linda"** (last name unknown) is a nurse at the Williamson County Jail who oversaw Plaintiff's medical intake and care during her pretrial detention. She is sued in her official and individual capacity for deliberate indifference to Plaintiff's serious medical needs and other unconstitutional treatment in violation of the Fourteenth Amendment.

➤ **Defendant John and Jane Doe Vanderbilt Hospital Staff** include unidentified legal and laboratory personnel who were involved in the release of Plaintiff's medical specimens and related data to law enforcement. These individuals are sued in their official and individual capacities for alleged joint participation with state actors in conduct that deprived Plaintiff of her constitutional rights to bodily integrity and due process.

➤ **Defendant John and Jane Doe Williamson County Jail Staff** include correctional officers, supervisors, nurses, and other jail medical personnel who participated in decisions affecting Plaintiff's housing, care, treatment, and safety during her incarceration. They are sued in their official individual capacities for actions taken under color of state law, including deliberate indifference to Plaintiff's medical needs and imposition of punitive conditions unrelated to any legitimate governmental objective.

4

➤ **Defendant Judge "Tom" Taylor** was at all relevant times a Judge of the Williamson County Circuit Court for the 21st Judicial District of Tennessee, presiding over pretrial and bond proceedings in Plaintiff's criminal case. He is sued in his individual and official capacity for actions taken under color of state law that violated Plaintiff's constitutional rights to due process and an impartial tribunal. Specifically, Judge Taylor presided over proceedings in which Plaintiff's bond was set at an excessive and punitive amount, based not on legitimate considerations of flight risk or public safety, but on her family's assets and the inflammatory nature of the allegations. During these proceedings, Judge Taylor placed Plaintiff's parents under oath, questioned them regarding the value of their home, and allowed irregular evidentiary submissions that contributed to an arbitrary bond determination. These actions, undertaken while exercising state authority, deprived Plaintiff of equal protection and the right to a fair and impartial judicial process.

➤ **At all times relevant, each Defendant acted under color of state law.** Where private hospital staff are named, they are sued under §1983 for willfully participating in, and conspiring with, state officials to deprive Plaintiff of her rights (e.g., acceding to law enforcement pressure to deny care or seize evidence without consent).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

Plaintiff Ashley Kroese alleges that, to the extent any claims asserted herein fall within the scope of the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), she was either not required to exhaust administrative remedies or such remedies were effectively unavailable to her.

Specifically, during her detention at the Williamson County Jail, Plaintiff was suffering from multiple traumatic injuries, placed on suicide watch, denied meaningful access to

5

information or assistance, and held in restrictive housing under conditions that impeded her ability to file any grievance. She was not advised of any grievance procedures, not provided forms or instructions, and was physically and cognitively impaired due to her injuries and the jail's own classification decisions. Jail staff did not offer assistance and, on information and belief, actively obstructed or discouraged her from filing grievances related to her treatment.

Under the legal standard articulated in *Ross v. Blake*, 578 U.S. 1174, 136 S. Ct. 1850 (2016), administrative remedies that are not "available" within the meaning of the PLRA—i.e., remedies that are opaque, functionally dead-ends, or obstructed by officials—need not be exhausted. Plaintiff alleges that any grievance process was effectively unavailable due to these conditions. Alternatively, if exhaustion is deemed required, Plaintiff respectfully asserts that she is entitled to develop a factual record supporting this claim.

Accordingly, no claims herein should be dismissed for failure to exhaust administrative remedies at the pleading stage.

## FACTUAL ALLEGATIONS (Chronologically Organized)

### A. June 18, 2020 – Automobile Crash and Emergency Treatment at Vanderbilt

4. In the early morning hours of June 18, 2020, Plaintiff Ashley Kroese was involved in a head-on automobile collision on Franklin Road in Williamson County, Tennessee. Plaintiff sustained severe injuries and remained conscious at the scene. She was transported by Emergency Medical Technicians to Vanderbilt University Medical Center ("VUMC") in Nashville for emergency trauma care. The other driver involved in the collision, Brentwood Police Officer Destin Legieza, was not wearing his seatbelt at the time of the crash and tragically lost his life as a result of the accident.

6

**5.** Upon arrival at Vanderbilt University Medical Center's Emergency Department, Plaintiff was admitted for treatment of multiple traumatic injuries, including a fractured arm, a crushed foot with multiple fractures, a dislocated toe, several rib fractures, a collapsed lung, a subarachnoid brain hemorrhage, and other internal injuries. She underwent surgical intervention and was subsequently admitted to the intensive care unit for continued monitoring and treatment.

**6.** Despite Plaintiff's critical condition, law enforcement initiated an investigation immediately upon her hospitalization. Tennessee Highway Patrol Trooper Matthew Priest visited Plaintiff in the emergency room and asked her questions while she was undergoing treatment. Although Plaintiff was medicated and in pain, she was able to communicate coherently with law enforcement. A patrol vehicle dash-cam recorded part of this interaction. Plaintiff alleges that the nature and extent of her communication were later mischaracterized in official proceedings.

**7.** In the course of Plaintiff's emergency care, emergency medical personnel administered opioid pain medication, including two doses of Fentanyl beginning at approximately 5:38 a.m. on June 18, 2020, prior to Plaintiff's arrival at Vanderbilt University Medical Center. The administration of such medication reflects a clinical judgment that the patient was not exhibiting signs of acute intoxication, as administering opioids to a severely impaired individual would present heightened medical risks. None of the responding police officers, EMTs, and hospital personnel reported any visible signs of intoxication, and no odor of alcohol was documented by first responders at the scene

**8.** As part of routine trauma care, VUMC staff drew blood from Plaintiff for medical testing. One such draw occurred at approximately 5:56 a.m. that morning. Lab results from that sample did not reflect the presence of Fentanyl, despite the recent administration of the drug.

7

This inconsistency raised internal questions about sample identification and handling, though no formal investigation was initiated at the time.

9. At the scene of the crash in Williamson County, law enforcement officers reportedly expressed uncertainty about Plaintiff's condition and conduct, stating on camera that they lacked conclusive evidence and were unsure what had occurred. Nonetheless, a decision was made to seek a search warrant for Plaintiff's blood, with Assistant District Attorney Jamie Pulido advising officers to proceed even if Plaintiff might consent, ostensibly to preserve evidentiary integrity.

10. Trooper Matthew Priest obtained a search warrant for Plaintiff's blood later that day. Rather than arranging for a fresh forensic draw pursuant to the warrant, officers obtained four vials of blood that had already been drawn by Vanderbilt University Medical Center for medical purposes several hours earlier. These vials—originally collected for diagnostic use during the height of the COVID-19 pandemic—had already been accessed, manipulated, and tested for clinical purposes before being released to law enforcement. No written consent was obtained from Plaintiff or her healthcare proxy prior to the release of these specimens, and Plaintiff was under sedation or otherwise medically incapacitated at the time. The warrant authorized the collection of evidentiary blood but did not expressly authorize the seizure or forensic use of previously drawn, medically obtained specimens.

11. Troopers Matthew Priest and Ryan Nieuwenhuis jointly obtained the blood vials from Vanderbilt University Medical Center and placed them into a Tennessee Bureau of Investigation ("TBI") crime lab evidence kit outside the hospital. Both troopers testified that they went to the Davidson County Courthouse to return the search warrant before transporting the evidence to the TBI laboratory. Nieuwenhuis maintained that he kept the vials in his patrol car, while Priest traveled separately to the courthouse. However, Computer-Aided Dispatch (CAD) records show

8

that Priest went to the crash scene shortly after leaving Vanderbilt—contradicting both his sworn testimony that he went directly to the courthouse and his prior testimony that he never went to the crash scene. This discrepancy, combined with the prolonged period during which the vials remained in a patrol car on a hot summer afternoon without active cooling, violated accepted forensic evidence-handling protocols and created a significant risk of contamination, degradation, or loss of evidentiary integrity.

12. Official statements and testimony regarding the chain of custody for the blood samples contained discrepancies. Conflicting reports were made regarding officer movements and transport procedures between VUMC, the courthouse, and the TBI lab. These inconsistencies have not been reconciled and raise procedural concerns about evidence handling and documentation.

13. No person who actually performed the blood draw has been identified by name. Neither law enforcement nor Vanderbilt has provided a clear record of the individual responsible for drawing and labeling the samples in question. The TBI analyst who received the samples could only confirm receipt of vials labeled with Plaintiff's name but could not verify their collection or custody prior to delivery.

14. Photographs of the vials were taken several months after the incident and at a low resolution. These images were later used in court proceedings. Metadata from the photographs indicates they were created in October 2020, with no clear explanation for the delay. Variations in vial cap color and other irregularities have raised additional questions. Plaintiff alleges that these chain-of-custody and documentation issues reflect a departure from accepted evidence-handling practices and violated her constitutional rights to due process and privacy in the handling of medical information and bodily materials.

9

**15.** While Plaintiff was recovering in the Intensive Care Unit (ICU) from June 18 to June 21, 2020, her family attempted to stay involved in her care. Hospital staff initially restricted parental access, citing policy and law enforcement involvement. Plaintiff's mother was allowed a brief visit on the evening of June 18. Family members received limited information, often communicated informally or on handwritten notes. These restrictions caused distress and limited the family's ability to advocate for Plaintiff's medical needs.

**16.** During this hospitalization, Plaintiff was subjected to harsh and dismissive treatment by certain hospital personnel. She experienced delays in receiving prescribed pain medication, and on at least one occasion was left on a bedpan for an extended period (two to two and one half hours) without assistance. Family members had to intervene to secure timely care. The environment of her care appeared hostile and punitive, reflecting possible bias due to the nature of the incident.

**17.** Plaintiff's father requested a comprehensive toxicology screening while she was hospitalized, but this request was not honored. Hospital staff did not explain the refusal. No additional testing was performed beyond routine lab work. Plaintiff alleges that medical decisions were unduly influenced by the presence and priorities of law enforcement personnel rather than patient-centered care.

**18.** In the early morning hours of June 21, 2020, Plaintiff was formally placed under arrest by law enforcement while still confined to her hospital bed. Officers were stationed outside her ICU room, and her family was informed that visitation would no longer be permitted. This transition from patient to arrestee occurred while Plaintiff remained medically fragile.

**19.** Hospital staff had previously indicated that Plaintiff required a minimum of two more weeks of inpatient care. However, law enforcement expressed an intent to transfer her to jail by

10

June 22, 2020. Plaintiff's mother raised concerns with hospital staff, who acknowledged that her condition warranted continued inpatient treatment. Despite this, discharge planning was deferred to law enforcement preferences.

20. On June 22, 2020, Plaintiff was discharged from Vanderbilt University Medical Center into police custody. Her discharge was initiated by a nurse practitioner Linda Wilkinson around 1:21 p.m., who stated that she was 'being made to sign' the release form prematurely—approximately two weeks before Plaintiff's expected recovery period. The supervising physician, Dr. Oliver Lee Gunter, Jr., did not sign off on the discharge until 9:21 p.m. that evening, more than eight hours later. At the time of her release, Plaintiff remained in a wheelchair, with orthopedic braces and unresolved pulmonary injuries. No coordinated discharge plan was implemented to ensure continuity of care or to provide appropriate medical accommodations in custody. Plaintiff alleges that her release from the hospital was premature and influenced by external or prosecutorial pressure rather than independent medical judgment.

21. Following her transfer, Plaintiff received minimal follow-up care. Her treatment for multiple serious traumatic injuries—including a fractured arm, multiple foot fractures, rib fractures, a collapsed lung, a subarachnoid brain hemorrhage, and intestinal bleeding—was abruptly discontinued. Jail medical personnel failed to implement or continue the hospital's prescribed care plan, resulting in severe pain, complications, and deterioration of her condition.

**B. June 22 – July 7, 2020: Detention at Williamson County Jail – Denial of Medical Care and Basic Humane Treatment**

22. Upon arrival at the Williamson County Jail on June 22, 2020, Plaintiff was subjected to a humiliating and unnecessary intake process. Despite having never expressed any suicidal ideation or intent, jail staff immediately placed Plaintiff on "suicide watch" status. Plaintiff was

11

shocked at this designation; when a nurse performed a mental health screening and asked how Plaintiff felt, Plaintiff replied that she felt "shocked" (understandably, given the accident and her arrest). Interpreting or using this single word in bad faith, the jail designated her as a suicide risk. This resulted in Plaintiff being stripped of her clothing and possessions and forced to wear a degrading "turtle suit" – a heavy, blanket-like smock intended to prevent self-harm. Even then, the jail failed to provide the full suicide watch equipment: Plaintiff was given the smock without the accompanying padded cover or proper fasteners, leaving her exposed and cold as the Velcro on the suit would not stay secured.

23. During her initial incarceration in June 2020, Plaintiff was held in a quarantine/lockdown intake pod under COVID-19 procedures. The cell was filthy and ill-suited for a medically vulnerable person. The bunk was a bare metal slab that hadn't been cleaned; the cell's toilet was encrusted with another inmate's feces. Because she was on suicide watch, Plaintiff was not given any linens initially, meaning she had to lie on the cold, dirty metal with her injuries. She was freezing, dressed only in the thin suicide smock which did not close properly. Plaintiff's requests for something to keep her warm or to cushion her were ignored.

24. During her initial incarceration in June 2020, Plaintiff's serious injuries required special accommodations, which the Williamson County Jail blatantly failed to provide. Hospital physicians had directed that Plaintiff's injured leg remain elevated to reduce swelling and pain. When Plaintiff informed a jail officer of this medical directive and requested a means to elevate her leg, the officer mockingly retorted, 'You'll figure it out; you have a master's degree.' This flippant remark exemplified the jail staff's deliberate indifference: rather than assist or provide a simple pillow or prop as medically required, they ridiculed her and left her to suffer in pain

12

25. During her initial incarceration in June 2020, even the most basic tasks—such as using the toilet—became a grueling ordeal for Plaintiff due to her medical condition and the jail's refusal to provide adequate assistance. With one arm immobilized in a cast and sling, one foot in a cast, and the other foot severely bruised, Plaintiff was unable to walk or balance normally. Although the jail issued her a wheelchair, no one was assigned to help her transfer or use the bathroom. Each time Plaintiff needed to relieve herself, she was forced to push up with one arm, balance precariously on her less injured leg, and hop to the toilet in extreme pain, risking falls and further injury. After approximately a week, the jail finally provided a plastic bedside commode frame with armrests to place over the toilet—equipment that should have been supplied immediately. Even then, the commode was filthy, caked with excrement upon issue, as if to remind Plaintiff that she was not to be treated with dignity.

26. During her initial incarceration in June 2020, perhaps the most acute form of mistreatment was the jail's denial of Plaintiff's prescribed pain medication and other medically indicated therapies. Upon discharge from Vanderbilt University Medical Center, Plaintiff had been prescribed opioid pain relievers appropriate for the severity of her injuries. On her first day in custody, Defendant Nurse 'Linda' explicitly refused to provide the doctor-prescribed medication, snapping, 'This is a jail, not a hospital.' She further stated that the administration of pain medication would be left to each nurse's discretion—implying that some might dispense it and others might withhold it, depending on personal attitude rather than medical judgment. Over the two weeks Plaintiff remained incarcerated, she was largely denied her pain medication, receiving it only sporadically or not at all. As a result, she endured excruciating pain from broken bones, soft-tissue injuries, nerve damage and other trauma with minimal relief. Jail personnel's

13

deliberate indifference and punitive attitude toward her suffering effectively used untreated pain as a form of punishment.

27. The only medical intervention the jail seemed intent on providing was a daily injection to prevent blood clots (likely an anticoagulant such as heparin, given Plaintiff's immobilization and recent surgery). However, even this was handled chaotically. Initially, staff did not explain what the injection was for, and some nurses approached Plaintiff aggressively to inject her abdomen while she was confused and resistant (understandably, since no one told her why she was being stuck with a needle). Plaintiff, wary of unknown injections, at first refused shots in her stomach; eventually a nurse told her it was to prevent blood clots, after which Plaintiff agreed to take the shots in her arm. Despite the importance of these anticoagulant shots, the jail failed to administer them daily as ordered. Several days went by without the injections until one conscientious nurse took Plaintiff out of her cell for a short walk and realized the daily shots had been skipped. That nurse was upset and stated that these shots needed to be given every day to be effective. In short, even when jail staff knew of a critical preventative treatment, they inconsistently provided it, putting Plaintiff at risk of a potentially deadly blood clot.

28. Jail personnel also deprived Plaintiff of her prescribed medical equipment. Plaintiff had been provided a post-op "surgical shoe" at the hospital for her injured foot (or toe) – a protective shoe that Velcros on to allow walking without full weight and to stabilize the foot. This surgical shoe was confiscated and thrown in the trash by jail staff upon her intake. They instead gave her standard issue plastic slippers ("crocs") which were not appropriate for her injury. Consequently, when Plaintiff had to move, she ended up overusing her other foot (which was initially just bruised) to hop, since one foot was non-weightbearing. The strain caused her "good" foot to become severely bruised and swollen; it turned completely black and remains

14

painful to this day. The needless disposal of her surgical shoe directly worsened her injuries and recovery, demonstrating callous disregard for her well-being.

29. After some days, Plaintiff was moved off of suicide watch (and into a regular orange jumpsuit), but even this came with indignities. The jail issued her a jumpsuit far too small – a size Small, though Plaintiff was a Medium – such that the pants split open over her hips, where she had raw, abraded skin from the car crash seatbelt. The tight, ripping fabric rubbed against her wounds, causing bleeding and intense pain. Plaintiff showed an officer that her pants were bloody and asked for a larger size, but jail staff insisted they "didn't have anything bigger" (which strains belief). Similarly, they initially gave her undergarments that did not fit, and she had to specifically plead for boxer-style shorts to reduce chafing on her injuries.

30. To compound her humiliation, shortly after being taken off suicide watch, Plaintiff began menstruating (her menstrual period started). Jail staff did not promptly supply her with adequate feminine hygiene products. Plaintiff was left bleeding on herself for hours before they finally provided sanitary pads. The delay was so lengthy that her clothing was soiled. Even after receiving pads, Plaintiff, due to her physical injuries, required assistance to clean herself properly – assistance which was not provided. She requested a shower to properly cleanse her body (especially after bleeding through her clothes), but the jail refused to allow one at that time.

31. Showers and basic cleanliness were rare privileges for Plaintiff in her two-week detention. Despite her injured state (which made personal hygiene difficult without help), Plaintiff was only permitted to shower three (3) times in 14 days. She repeatedly begged for the chance to bathe, as she felt dirty and was literally caked in blood and sweat. Jail officers repeatedly told her "no" or gave excuses such as not having a female officer available to

15

supervise (even though days passed without arrangement). The lack of hygiene caused Plaintiff additional distress and risk of infection to her wounds.

32. The attitudes of certain correctional officers were openly cruel. Routine jail procedures were turned into opportunities to torment Plaintiff. For example, during daily "count" (headcount/roll-call of inmates), officers knew Plaintiff had broken ribs and great difficulty moving. Yet, *most* guards forced Plaintiff to either sit up on her bunk or even stand at the cell door for count, ignoring her obvious agony as she struggled up and often took a long time due to pain. Some guards would watch her slow, painful movements with impatience or ridicule, showing no empathy for her condition.

33. At mealtimes, although Plaintiff was clearly mobility-impaired and had only one usable arm, some officers refused to bring her food tray to her bunk (which would have been a minor accommodation) – instead requiring her to shuffle to the cell door to get it. Once she had the tray, they would not assist in opening milk cartons or fruit containers, even when she asked nicely (these containers are hard to open one-handed). On one occasion an officer flatly said "I'd rather not" than help her open a bottle, leaving Plaintiff frustrated and at times unable to eat or drink parts of her meal. Such small refusals accumulated into a picture of pervasive mistreatment.

34. A critical piece of medical equipment that Plaintiff needed was a breathing treatment apparatus (likely an incentive spirometer or nebulizer) for her lung. In the hospital, she had a collapsed lung and was given a device to help re-expand and exercise her lung to prevent pneumonia. The jail confiscated or failed to provide this device upon her arrival. Plaintiff repeatedly asked for it, explaining it was prescribed for her recovery. Yet it took "several days" before the jail finally gave Plaintiff her breathing treatment device. During those days without it,

16

Plaintiff's breathing was shallow and painful. On one occasion, Plaintiff began experiencing severe difficulty breathing – a possible sign of incomplete lung expansion or mucus buildup. She told a guard she was struggling to breathe. The guard initially ignored her distress until it became obvious she was in crisis (gasping). Only then did the guard call a medical "code" for assistance. A nurse responded, but instead of immediately providing oxygen or ensuring she had her breathing treatment, the nurse (or guard) handed Plaintiff a wet rag that had been dropped on the floor, telling her to put it on her face. This unsanitary and medically useless gesture typified the care she received – perfunctory at best, dangerous at worst. Eventually, as noted, they gave her the proper device, which she should have had from day one.

35. Throughout her custody, jail staff made demeaning and retaliatory comments towards Plaintiff. Many officers were well aware of the news coverage of her case (as described below), and some took out their anger or disgust on her verbally. Plaintiff heard staff members say cruel things about her situation, essentially conveying that she deserved to suffer. She was treated as guilty and contemptible from the start.

36. The *environment* of the jail further underscored that Plaintiff was being singled out due to the nature of her alleged crime (the death of a police officer). In an extraordinary breach of professional conduct, the jail repeatedly broadcast news segments about Plaintiff's case on the jail's common area televisions. Other inmates informed Plaintiff (and she later witnessed herself) that coverage of Officer Legieza's funeral motorcade – involving over 100 police cars – and news reports about Plaintiff's charges and even snippets from her court appearances, were shown in the jail. Typically, jails avoid showing inmates news about their own cases, especially in a way that could incite harassment or violence. Here, however, such footage was played, potentially inciting other inmates or staff against Plaintiff and certainly ensuring that everyone knew who

17

she was and why she was there. Plaintiff reasonably felt this was done to shame and psychologically punish her. She feared for her safety and doubted she could receive fair treatment in such an atmosphere.

37. Due to her family's efforts, Plaintiff was released on bond on July 6, 2020, after approximately 14 days in the jail. The General Sessions Judge had set bond at $750,000 – an extraordinarily high amount for a vehicular homicide charge. District Attorney Kim Helper actively opposed a lower bond, citing Plaintiff's dual citizenship and the seriousness of the charges. Plaintiff alleges that the prosecution influenced the bond decision in a manner not reasonably related to ensuring her appearance or protecting the public, but rather intended to extend her incarceration and exhaust her family's resources. The amount was allegedly set with knowledge of her family's financial position and calibrated to impose financial strain. Her family ultimately posted bond at significant expense. These facts support Plaintiff's claim that bond decisions in her case reflected punitive intent, contrary to the presumption of innocence and the Eighth Amendment prohibition on excessive bail.

38. In summary, during Plaintiff's initial post-arrest hospitalization and first detention period (June 18 – July 7, 2020), the following constitutional violations occurred:

- **Deliberate Indifference to Medical Needs:** Vanderbilt medical staff, acting in concert with law enforcement, nefariously discharged Plaintiff approximately two weeks before she was medically well enough to leave the hospital. The discharge was initiated by a nurse practitioner—rather than an attending physician—under apparent external pressure related to the criminal investigation. At times, Vanderbilt personnel withheld treatment, including adequate pain medication, due to the nature of her case. Once in custody, jail medical staff ignored hospital directives and refused essential care, including prescribed pain management, daily

18

anticoagulant injections, and necessary medical devices. Jail officers further refused to provide

basic accommodations for her disabilities and hygiene. This deliberate indifference by both

hospital and jail personnel caused Plaintiff needless suffering, prolonged pain, and exacerbation

of her serious injuries.

- **Unlawful Search and Seizure (Blood Draw):** Law enforcement seized

Plaintiff's blood for investigatory purposes without her consent and without adhering to proper

warrant protocol or medical privacy protections. Plaintiff alleges this constituted an unreasonable

search and seizure in violation of the Fourth Amendment. These actions occurred while she was

incapacitated and without consultation with her health care proxy or family.

- **Denial of Due Process:** Officials misrepresented Plaintiff's medical condition to

circumvent her constitutional rights—claiming she could not consent, while selectively using her

statements against her. The prosecutor (Helper) and others engaged in conduct aimed at

punishing and humiliating Plaintiff before any trial, including orchestrating punitive measures

such as unwarranted suicide watch and the imposition of an exorbitant bond designed to ensure

her continued detention. At the initial bail hearing, Judge Taylor placed Plaintiff's parents under

oath, questioned them about the value of their home, and set bail based on her family's assets

rather than Plaintiff's own financial circumstances—despite her unemployment and indigent

status. During that same proceeding, Officer Mitchell presented a hand-drawn reconstruction of

the crash as part of the State's argument for high bond. The drawing was later reported lost by

Judge Taylor's secretary, prompting the judge's eventual recusal from the case. The

disappearance of this material exhibit and the court's irregular handling of the bond proceeding

reflect a broader pattern of procedural misconduct that deprived Plaintiff of fundamental fairness.

Collectively, these actions violated established standards for individualized bail determination

19

and impartial adjudication, resulting in a deprivation of liberty without due process of law. Law enforcement and hospital staff's handling of evidence and interactions with Plaintiff were so biased and egregious as to "shock the conscience," constituting a substantive due process violation.

- **Punitive Conditions of Confinement:** The jail conditions imposed on Plaintiff — unnecessary suicide watch, unsanitary and cruel treatment, denial of hygiene and assistance, etc. — were not reasonably related to any legitimate government objective (like safety or health) but appeared motivated by an intent to chastise. As a pretrial detainee, Plaintiff had a Fourteenth Amendment right to be free from punishment; yet she was effectively punished via deplorable conditions and mistreatment (violating *Bell v. Wolfish*, 441 U.S. 520 (1979)).

## C. February 22, 2022 through May 6, 2022: Post-Conviction Retaliation and Continued Violations

**40.** Plaintiff remained out on bond prior to trial under extraordinarily punitive and costly conditions imposed by Judge Taylor. Despite having one leg immobilized in a cast, Plaintiff was required to wear two ankle monitors—one on each leg, including the injured leg in a cast— consisting of a GPS tracker and an alcohol-monitoring device. Her family was required to pay approximately $600 per month for these devices over a period of 19.5 months, amounting to a substantial financial burden. In February 2022, Plaintiff's criminal case proceeded to jury trial in the Williamson County Circuit Court, a proceeding that received extensive media attention due to the victim's status as a law enforcement officer. On February 18, 2022, following the jury's verdict, Defendant District Attorney Kim Helper directed that Plaintiff be remanded into custody in an intentionally public and humiliating manner. At Helper's instruction, officers handcuffed Plaintiff using the personal handcuffs that had belonged to the deceased officer, Officer Destin

Legieza. The use of these particular restraints served no legitimate security purpose and appeared designed to publicly shame and emotionally harm Plaintiff. Plaintiff experienced this act as degrading, retaliatory, and inconsistent with the neutrality required of prosecuting officials. The gesture, widely observed and reported, reflected personal animus rather than lawful exercise of prosecutorial authority

41. Following the verdict, Plaintiff was transported to the Williamson County Jail pending sentencing. Remembering the severe mistreatment she endured during her prior 2020 detention, Plaintiff made every effort to cooperate fully with intake staff. She expressly stated she did not feel suicidal and had no intent of self-harm. The intake nurse evaluated her accordingly and initially cleared her for a standard housing assignment. Plaintiff was issued a standard jail uniform and began the process of settling into custody.

42. Shortly thereafter, a corrections officer informed Plaintiff that she was being placed on "suicide watch." The officer apologized, stating that this decision came from "the city attorney," believed to be a government attorney associated with Plaintiff's prosecution or with Williamson County. Jail records and staff statements suggested that this directive originated outside the jail's medical chain of command and contradicted the initial screening determination. Plaintiff was again stripped of normal clothing and possessions and required to wear a heavy "turtle suit" designed for suicide prevention. She remained in these conditions for several days despite the absence of any clinical basis for suicide watch designation.

43. During this post-trial detention, Plaintiff was denied hygiene items, such as a toothbrush or soap, while placed on suicide watch. After several days, she was evaluated via video conference by a mental-health professional, who confirmed there was no justification for the designation. Plaintiff was subsequently moved off suicide watch but was kept in "protective custody," a form

of isolated confinement, for several more days without cause. Jail officers informed Plaintiff that many staff members had viewed her trial through live feed in the control room and had discussed it internally. Some officers expressed sympathy for how harshly she was being treated. Plaintiff alleges that her placement on suicide watch and in isolation was punitive and retaliatory, reflecting official bias related to the nature of her case rather than any legitimate security need.

44. During her second incarceration beginning in February 2022, Plaintiff's placement on suicide watch appears to have been punitive rather than based on any genuine assessment of self-harm risk. Jail staff later admitted to her that they 'didn't have a choice' in the matter—suggesting that the order originated from higher-level officials aware of her case, possibly due to the victim being a police officer. On information and belief, Defendant District Attorney Kim Helper or others in her office communicated with jail administrators regarding Plaintiff's treatment as a high-profile or high-security inmate. Regardless of origin, the result was that Plaintiff spent her first days after conviction in extreme discomfort and degradation—not because of any disciplinary infraction or clinical concern, but as a form of extra-judicial punishment. The jail provided her no pillow, no blanket (at first), no clothing besides the abrasive smock, and no hygiene items whatsoever. She was not allowed even a toothbrush or soap, and was given only a few pieces of toilet paper at a time, 'on demand,' when she begged for it.

45. Plaintiff's post-verdict treatment demonstrates a continuing pattern of retaliation and abuse of power by public officials. Actions such as ordering the use of symbolic restraints belonging to the victim and imposing unwarranted suicide-watch and isolation measures served no legitimate penological or administrative purpose. These acts constituted punishment for Plaintiff's exercise of constitutional rights—specifically, her right to a trial and to maintain her innocence—and violated the Fourteenth Amendment's guarantee of substantive due process during the

22

pre-sentencing period, as well as the Eighth Amendment's prohibition on cruel and unusual treatment once her sentence commenced. The conduct of Defendants Helper and other involved officials reflected deliberate misuse of governmental authority to inflict humiliation and emotional distress.

46. From the time of her hospitalization through her post-conviction confinement, Plaintiff was consistently subjected to retaliatory and degrading treatment by state and county officials acting individually and in concert. Their actions deprived her of basic constitutional protections, including due process, humane conditions of confinement, and freedom from punishment not authorized by law. These violations are described in greater detail in the Causes of Action below.

## CAUSES OF ACTION

Each of the following counts realleges and incorporates by reference all paragraphs above as if fully set forth therein.

### Count I – 42 U.S.C. § 1983 – Deliberate Indifference to Serious Medical Needs

*(Against Vanderbilt Medical Staff Defendants Osborne, "Chandler", and Doe staff; and Williamson County Jail Nurse "Linda" and Doe Medical/Correctional Staff)*

Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

**47. Constitutional Violation:** Plaintiff was a pretrial detainee during the relevant period (June 21–July 6, 2020) and was therefore entitled to medical care under the Due Process

23

Clause of the Fourteenth Amendment. Under clearly established law, a government official violates this right by acting with deliberate indifference to a detainee's serious medical needs. For pretrial detainees, the standard is whether the official's conduct was objectively unreasonable in light of the known medical risk—not whether the official acted with subjective intent to harm. See *Kingsley v. Hendrickson*, 576 U.S. 389, 397–98 (2015); *Brawner v. Scott County*, 14 F.4th 585, 591–92 (6th Cir. 2021). This standard is distinct from the Eighth Amendment test that applies to convicted prisoners. Plaintiff's injuries—including broken bones, a collapsed lung, and limited mobility—constituted objectively serious medical needs. Defendants' failure to provide prescribed medications, assistive devices, sanitation, and mobility accommodations was objectively unreasonable and thus violated Plaintiff's constitutional rights.

**48.** Serious Medical Needs: Plaintiff's injuries sustained in the automobile crash were objectively serious and required continuous medical treatment. These included severe orthopedic injuries—such as a fractured arm, a crushed foot with multiple fractures, and a dislocated toe—that necessitated surgical intervention, immobilization, casting, and bracing. She also suffered significant internal trauma, including a collapsed lung requiring insertion of a chest tube and breathing support, multiple rib fractures causing extreme pain with each movement, a subarachnoid brain hemorrhage, and intestinal bleeding. Plaintiff experienced acute, unrelenting pain and remained physically incapacitated, requiring assistance with virtually all basic activities, including mobility, toileting, and personal hygiene. The seriousness of these medical conditions was readily apparent to any lay observer and unquestionably evident to trained medical personnel and correctional staff, who were aware of her condition yet failed to provide appropriate treatment or accommodations.

24

Despite the clear and documented severity of these injuries, both Vanderbilt personnel and Williamson County Jail staff displayed deliberate indifference to her medical needs, resulting in unnecessary suffering and further harm

**49. Deliberate Indifference of Vanderbilt Staff:** Defendants Nurse Allie Osborne, Nurse "Chandler," and other unidentified medical or administrative staff at Vanderbilt University Medical Center acted with deliberate indifference to Plaintiff's serious medical needs by placing law enforcement priorities above sound medical judgment. Despite Plaintiff's unstable condition and indications from treating providers that she required continued inpatient care for at least two additional weeks, Defendants authorized her discharge on June 22, 2020—just four days after a traumatic accident and major surgery. This decision was made while Plaintiff remained in acute pain, required assistive devices, and lacked sufficient mobility or respiratory stability for custodial transfer. The timing and circumstances of the discharge suggest that the decision was made to accommodate law enforcement's request to assume custody rather than based on medical necessity. While hospitalized, Plaintiff was also subjected to care delays, neglect of basic needs, and hostile treatment. VUMC staff failed to timely administer pain medication—prompting family members to intervene—and left Plaintiff unattended for prolonged periods while in need of assistance. These failures were not isolated incidents or mere negligence, but occurred in the context of Plaintiff being treated differently due to the nature of the pending investigation. Once Plaintiff was placed under arrest at the hospital, staff ceased to advocate for her medical needs and facilitated her transfer to jail custody without a coordinated discharge plan or continuity of care. Such conduct constitutes deliberate indifference under clearly established constitutional standards. When the State, through medical providers acting jointly with law enforcement, assumes

25

custody or control over an injured individual, it bears an affirmative duty to ensure that the individual receives adequate medical care. *See City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983); *DeShaney v. Winnebago Cty.*, 489 U.S. 189, 199–200 (1989). By discharging Plaintiff prematurely, withholding appropriate care, and failing to coordinate post-discharge treatment, Vanderbilt staff violated these constitutional obligations while acting under color of state law.

49. **Deliberate Indifference of Jail Medical Staff:** Defendant Nurse "Linda," believed to be the lead intake nurse at the Williamson County Jail, along with other unidentified jail medical personnel, acted with deliberate indifference to Plaintiff's serious medical needs during her incarceration. These officials were fully aware of Plaintiff's condition, having received her hospital discharge papers, prescription records, and direct visual confirmation of her injuries—including casts, bruising, surgical dressings, and restricted mobility. Despite this knowledge, jail staff refused to administer Plaintiff's prescribed medications, including opioid pain relievers ordered for the management of post-operative pain. On her first day in custody, Nurse Linda reportedly dismissed Plaintiff's request for pain medication by stating, "This is a jail, not a hospital." Over the course of Plaintiff's detention, pain medication was administered irregularly or withheld altogether. Given the nature of Plaintiff's injuries— including broken bones and surgical wounds—such denial of care was objectively unreasonable and caused her prolonged and unnecessary suffering. In addition, jail staff failed to consistently administer doctor-ordered anticoagulant injections prescribed to prevent blood clots due to Plaintiff's immobility and recent surgery. On several occasions, injections were missed altogether, despite staff being aware of the medical necessity. The failure to provide these treatments placed Plaintiff at risk of serious complications, including

26

pulmonary embolism. Jail medical staff also failed to timely provide a breathing therapy device prescribed for Plaintiff's collapsed lung. Despite repeated requests, the device was delayed for several days, during which time Plaintiff experienced significant difficulty breathing. The failure to promptly provide medically necessary equipment to a lung-compromised patient demonstrated an objectively unreasonable disregard for her respiratory condition. None of these failures can be attributed to medical judgment or inadvertence. The repeated refusal to provide essential medications, treatments, and equipment—despite clear medical orders and observable symptoms—constitutes deliberate indifference under the Fourteenth Amendment. The conduct of Nurse Linda and others, particularly the statement minimizing Plaintiff's need for care, further supports the inference that their actions were punitive rather than medically justified.

50. **Deliberate Indifference of Jail Correctional Staff:** Although not medical professionals, the Doe correctional officers at the Williamson County Jail had direct knowledge of Plaintiff's injuries and medical condition. Their daily interactions with Plaintiff placed them in a position to observe her severe impairments and obvious pain. Despite this, correctional staff repeatedly interfered with and failed to facilitate her medical care and accommodations. Specifically:

51. **Refusal to assist with leg elevation:** Officers ignored Plaintiff's repeated requests to elevate her injured leg as instructed by her hospital physicians. When she requested help, officers mocked her condition rather than providing even minimal assistance or supportive items.

52. **Compelling Painful Physical Movement:** Jail staff routinely required Plaintiff to stand, walk, or reposition herself during headcounts and other custodial procedures, despite full knowledge of her extensive traumatic injuries. Plaintiff's body had been shattered by the

27

crash—she suffered a fractured arm immobilized in a cast and sling, a crushed foot with multiple fractures, a dislocated toe, multiple rib fractures, a collapsed lung, internal bleeding, and a brain hemorrhage. Each forced movement caused excruciating pain, left her gasping for breath, and risked aggravating her fragile condition. Rather than providing accommodations or assistance, officers ignored medical restrictions and treated her immobility as defiance. These actions inflicted needless suffering, exacerbated her injuries, and demonstrated a callous disregard for her serious medical needs.

53. **Destruction of medical equipment:** Jail staff confiscated and discarded Plaintiff's post-operative surgical shoe without medical evaluation or replacement. The absence of this device worsened Plaintiff's condition, caused overuse of her uninjured foot, and led to further injury.

54. **Denial of hygiene and sanitation:** Plaintiff was denied timely access to showers and clean toilet facilities, despite open wounds and significant hygiene needs. These deprivations increased her risk of infection and compounded her discomfort and distress.

55. **Failure to assist with daily tasks:** Jail officers refused to assist Plaintiff with basic activities of daily living, such as retrieving food trays or opening containers, even though she had only one usable arm. This failure impacted her ability to maintain nutrition and self-care.

These actions were not isolated incidents, but part of a pattern of knowing disregard for Plaintiff's medical needs and functional limitations. While correctional staff are not required to provide medical care themselves, they are constitutionally obligated to avoid obstructing or impeding access to necessary treatment and accommodations.

The conduct of these officers—including intentional interference with prescribed medical protocols and the denial of assistance with medically necessary tasks—was objectively

28

unreasonable under the circumstances and violated Plaintiff's Fourteenth Amendment rights. See

*Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976) (deliberate interference with medical treatment

may violate the Constitution); *Brawner v. Scott County*, 14 F.4th 585, 591–92 (6th Cir. 2021).

The failure to accommodate Plaintiff's obvious disabilities, when doing so required minimal

effort, constituted deliberate indifference to her serious medical needs.

➤ **Causation and Harm: Causation and Harm:** As a direct and proximate result of

the deliberate indifference of the Defendants, Plaintiff suffered significant and lasting harm. This

includes:

**Unnecessary and prolonged physical pain**, resulting from the denial of prescribed pain

medications and the imposition of physically painful movements despite known injuries;

**Exacerbation of injuries**, including the deterioration of a previously minor foot injury

due to the confiscation of her surgical shoe and compensatory overuse, worsening of hip

abrasions due to ill-fitting clothing, and potential long-term impact on lung function due

to delayed respiratory therapy;

**Humiliation and emotional distress**, arising from the denial of access to basic hygiene,

sanitation, and compassionate care;

**Increased medical risk**, including elevated danger of blood clots due to missed

anticoagulant injections and heightened risk of infection from unsanitary living

conditions.

These harms were foreseeable consequences of the Defendants' failure to provide

constitutionally adequate medical care and humane conditions of confinement. Plaintiff

continues to experience physical pain and limitations, particularly in her foot and toe, as a result

of this mistreatment while in custody.

➤ The conduct of each Defendant named in this Count was not merely negligent but was carried out with willful disregard, reckless indifference, or knowing violation of Plaintiff's clearly established constitutional rights. Such conduct warrants the imposition of punitive damages, consistent with the standard set forth in *Smith v. Wade*, 461 U.S. 30, 56 (1983), as a means of punishing and deterring future misconduct by those acting under color of law.

Plaintiff also seeks compensatory damages for the physical pain, emotional distress, and medical complications she suffered as a direct result of Defendants' constitutional violations, as well for out-of-pocket costs and continuing harm stemming from inadequate care and injury aggravation during her pretrial detention.

As a pretrial detainee, Plaintiff had a clearly established constitutional right to adequate medical care under the Fourteenth Amendment. The Defendants named in this Count were aware of Plaintiff's serious medical needs and acted in a manner that was objectively unreasonable under the circumstances. Their refusal to provide prescribed medications, medical devices, basic sanitation, and accommodations for Plaintiff's limited mobility caused her avoidable pain, worsened injuries, and placed her at risk of serious medical complications.

These actions—taken despite clear evidence of Plaintiff's condition and medical directives—were not the result of mere negligence or institutional constraints. Rather, they reflected deliberate disregard for Plaintiff's health and safety by both medical and custodial personnel. Such conduct meets the constitutional threshold for deliberate indifference and resulted in significant and lasting harm.

Plaintiff therefore seeks:

- **Compensatory damages** for physical pain, emotional distress, and the aggravation of injuries sustained during custody;

- **Punitive damages** against the individual Defendants, whose conduct demonstrated reckless or callous disregard for her federally protected rights; and

- **Declaratory relief** recognizing that the denial of adequate medical care under these circumstances violates clearly established constitutional law.

# COUNT II – 42 U.S.C. § 1983 – Unlawful Search and Seizure (Fourth Amendment)

### *(Unconsented Blood Draw and Evidence Seizure)*

### (Against Defendants Trooper Nieuwenhuis, Trooper Priest, ADA Pulido, and Vanderbilt Doe Staff involved in the blood draw/transfer)

**51.** Plaintiff incorporates by reference the factual allegations concerning the blood draw and evidence handling (Paragraphs 7–14 and 18–24 above). Defendants Nieuwenhuis, Priest, and Pulido, together with Vanderbilt Doe legal and laboratory staff who assisted them, violated Plaintiff's rights under the Fourth Amendment to be free from unreasonable searches and seizures of her person and medical information.

**52. Lack of Consent and Absence of Exigent Circumstances:**

Taking blood from a person constitutes a search under the Fourth Amendment.
*Schmerber v. California*, 384 U.S. 757, 767 (1966). Warrantless blood draws are permissible only in narrow circumstances involving genuine exigency.
*Missouri v. McNeely*, 569 U.S. 141, 148 (2013). In this case, Plaintiff never consented to the seizure of her blood. At the crash scene she was incapacitated, and by the time she was conscious in the hospital, no officer or medical provider sought her consent. Law enforcement later obtained a search warrant, eliminating any claim of exigency. The constitutionality of the seizure

31

therefore turns on whether the warrant was executed within its lawful scope and in a reasonable manner.

**53. Scope of Warrant and Manner of Execution:**

The search warrant authorized collection of Plaintiff's blood for evidentiary testing, but Defendants exceeded that authority by seizing blood previously drawn by hospital staff for medical purposes. A reasonable execution of the warrant would have involved a new, medically supervised draw pursuant to the warrant's terms. Instead, officers took possession of vials drawn earlier for diagnostic treatment—specimens not collected under law-enforcement supervision or with evidentiary safeguards. This repurposing of private medical samples for criminal investigation, without Plaintiff's consent or explicit judicial authorization, constituted an unreasonable seizure of medical property and bodily information in violation of the Fourth Amendment. The warrant did not authorize the seizure of previously drawn medical specimens or override the privacy protections attached to them.

**54. Unreasonable Execution of Warrant:**

Even assuming the warrant covered existing vials, Defendants executed it in a manner that was objectively unreasonable:

- **Misleading Affidavit:** The warrant affidavit allegedly contained materially inaccurate statements concerning Plaintiff's driving distance in the wrong lane. If false or recklessly misleading statements were included, the warrant was constitutionally defective. *Franks v. Delaware*, 438 U.S. 154 (1978).

- **Failure to Provide Notice or Opportunity to Consent:** Officers did not present the warrant to Plaintiff or to her family before seizing the blood. Plaintiff—while hospitalized

and sedated—was never informed that a warrant had been issued, nor were her parents, who were present, consulted.

- **Improper Collection:** The officers did not request that qualified medical staff perform a new draw under controlled evidentiary conditions. Instead, Trooper Nieuwenhuis personally collected existing medical vials, contrary to the medical-supervision standards recognized in *Schmerber*.

- **Handling and Preservation:** The blood samples were transported without temperature control and left unrefrigerated in a vehicle for an extended period. The careless handling of seized biological evidence underscores the unreasonableness of the manner of execution. *See Dalia v. United States*, 441 U.S. 238, 258 (1979) (searches must be executed reasonably).

Collectively, these actions transformed a judicially authorized medical draw into a broad, intrusive, and unreasonable seizure of personal biological material.

**55.** These claims challenge the seizure itself and handling immediately following the draw, not the later use of the blood at trial (which is addressed in Plaintiff's separately filed Second Complaint).

**56. Involvement of Defendants:** Trooper Nieuwenhuis obtained and executed the warrant and is directly liable for the unconstitutional seizure. Trooper Priest participated in obtaining information for the warrant, accompanied Nieuwenhuis during the collection, and was aware that Plaintiff was medically incapacitated and incapable of providing consent. Assistant District Attorney Pulido, while ordinarily protected for advocative functions, acted here in an investigative capacity—advising officers at the crash scene and directing aspects of the warrant process—and therefore is subject to qualified, not absolute, immunity. *See Buckley v.*

*Fitzsimmons,* 509 U.S. 259, 273 (1993). Vanderbilt Doe legal and laboratory personnel, by releasing Plaintiff's medical specimens to law enforcement without obtaining consent or ensuring proper authorization, acted jointly with state officials under color of state law.

Moreover, the evidentiary materials obtained under the warrant were internally inconsistent and unreliable. The vials turned over by Vanderbilt contained color-coded tops and contents that did not match the documentation described in Troopers' reports or the testimony later offered at trial. Some vials were represented as containing whole blood while others appeared to contain serum or plasma inconsistent with forensic testing standards. These discrepancies—combined with the use of medically drawn specimens rather than a fresh forensic draw—demonstrate that the evidence was mishandled, altered, or improperly substituted. Vanderbilt personnel's cooperation in releasing those compromised materials, and the officers' acceptance and use of them as forensic evidence, rendered each participant jointly liable for an unreasonable and unlawful seizure under the Fourth and Fourteenth Amendments.

**57. Injury Resulting from the Violation:**

The seizure of Plaintiff's medical blood samples without her consent invaded her constitutionally protected privacy and bodily integrity. Individuals maintain a reasonable expectation of privacy in biological material drawn for medical care.

*Ferguson v. City of Charleston*, 532 U.S. 67, 78 (2001). Plaintiff suffered emotional distress, humiliation, and anxiety upon learning that her private medical samples were seized and used by law enforcement without her knowledge or consent. The unlawful seizure and mishandling of her biological property caused an ongoing sense of violation and loss of trust in medical confidentiality.

**57A. Unlawful Seizure of Personal Property:** Defendants also unlawfully seized Plaintiff's cellular telephone and personal effects while she was hospitalized and later detained. Officers removed her phone without a warrant and placed it among her personal property during her initial incarceration. When Plaintiff was released on bond fifteen days later, jail staff refused to return the phone but required her to sign a property-release form falsely stating that she had received all of her belongings. Plaintiff was told she could not be released unless she signed the form. In truth, her phone remained in law enforcement's possession, and her attorney was later forced to intervene to recover it. These actions—compelling Plaintiff to sign a false release under duress and withholding her property without lawful authority—constitute an unreasonable seizure and a deprivation of property without due process of law, independent of any later forensic use of the device in the criminal investigation

*(Note: This claim challenges the unconstitutional method of seizure and invasion of privacy, not the validity of Plaintiff's criminal conviction.)*

**58. Relief Requested:**

Defendants acted intentionally or with reckless disregard for Plaintiff's clearly established Fourth Amendment rights. Plaintiff seeks compensatory damages for emotional distress, loss of privacy, and other resulting injuries, together with punitive damages against the individual Defendants to deter similar misconduct. Plaintiff also seeks declaratory relief recognizing that the seizure and transfer of medical blood specimens without informed consent or clear judicial authorization constitute an unreasonable search and seizure, and injunctive relief requiring Tennessee law-enforcement and medical authorities to implement policies ensuring that such seizures comply with constitutional safeguards.

35

**COUNT III – 42 U.S.C. § 1983 –**

**Denial of Substantive Due Process (Fourteenth Amendment)**

**(Against Defendants Priest, Nieuwenhuis, Pulido, Helper, and Vanderbilt & Jail Staff Does for Conscience-Shocking and Retaliatory Conduct)**

59. Plaintiff alleges that certain conduct by the Defendants was so arbitrary, punitive, and abusive that it violated her substantive due process rights under the Fourteenth Amendment, which protects individuals from the exercise of government power that "shocks the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998). This Count addresses a continuing pattern of behavior by law-enforcement officers, prosecutorial officials, and cooperating staff that was retaliatory, degrading, or undertaken without any legitimate governmental justification, apart from the specific rights addressed in other Counts.

60. **Misrepresentation of Consent and Deception:**

Defendants Priest and Vanderbilt Doe staff misrepresented Plaintiff's capacity and statements while she was hospitalized to justify bypassing her right to make informed medical decisions. Trooper Priest later asserted that Plaintiff was non-responsive when, in fact, she was able to communicate coherently. This mischaracterization allowed officers to obtain and seize her medical blood samples without consultation or consent. Falsifying or omitting material facts about a detainee's condition to facilitate an evidence seizure constitutes an arbitrary abuse of power that deprives the individual of agency and bodily autonomy. The collective actions of Priest, Nieuwenhuis, and Pulido in obtaining and executing the warrant—without informing Plaintiff or her family—reflect investigative deception directed not at uncovering facts but at circumventing constitutional protections. Such conduct offends basic fairness and violates substantive due process.

36

**61. Symbolic and Humiliating Punishment (Use of Legieza's Handcuffs):**

Defendant District Attorney Kim Helper's decision to have Plaintiff publicly handcuffed with the deceased officer's personal restraints following the verdict served no legitimate governmental purpose. The act was intended to dramatize Plaintiff's punishment and humiliate her before the public. Actions by prosecutors or law-enforcement officials undertaken solely to degrade or shame an individual, rather than to further any lawful objective, violate substantive due process protections of human dignity.

*See Hope v. Pelzer*, 536 U.S. 730, 745 (2002); *Lewis*, 523 U.S. at 846. By orchestrating this symbolic display, Helper acted beyond her role as a neutral officer of justice and instead exercised her authority in a manner that shocks the conscience.

**62. Excessive Bond and Arbitrary Detention:** Defendant District Attorney Kim Helper, with assistance from Assistant District Attorney Jamie Pulido, advocated for a punitive $750,000 bond based on factors wholly unrelated to any legitimate concern of flight risk or community safety. Plaintiff alleges that the prosecution's arguments —including references to her "likelihood of conviction," her dual citizenship, and her family's financial resources—were deliberately designed to ensure prolonged detention and inflict financial hardship. During the bond hearing, Judge Joseph Woodruff Taylor departed from established procedure by placing Plaintiff's parents under oath, questioning them about the market value of their home, and setting bond based not on Plaintiff's individual financial status—she was unemployed and indigent—but on her family's assets. This wealth-based approach to bail contravenes the principles articulated in *Stack v. Boyle,* 342 U.S. 1, 5 (1951), which requires that bail be set only to reasonably ensure appearance at trial. Compounding the irregularities, Officer Mitchell presented a hand-drawn reconstruction of the accident as part of the State's argument for a high bond—a drawing that

was later reported lost by Judge Taylor's own secretary, prompting his eventual recusal from the case. These proceedings reflected an arbitrary departure from judicial impartiality and demonstrated prosecutorial and judicial conduct so tainted by bias and retaliatory intent as to "shock the conscience," in violation of the Fourteenth Amendment and the Excessive Bail Clause incorporated through it.

**63. Retaliatory and Vindictive Conduct**:

Throughout Plaintiff's case, Defendant Helper and others acted with retaliatory intent toward Plaintiff because she exercised her constitutional right to contest the charges and because of the public sensitivity of the case. This included public comments calculated to vilify Plaintiff, heightened publicity surrounding her detention, refusal to consider leniency, and direction of punitive measures following the verdict. Prosecutors and officials violate substantive due process when they use governmental power to punish a defendant for exercising constitutional rights or to gratify personal animus. *See Pool v. VanRheen*, 297 F.3d 899, 910 (9th Cir. 2002). Ordering or influencing the imposition of unwarranted suicide-watch or isolation measures after the verdict, if done to retaliate against Plaintiff, likewise constitutes an arbitrary and conscience-shocking abuse of authority.

64. **Abuse of Authority by Jail Staff with Official Encouragement**:

The retaliatory attitude of senior officials permeated the jail environment. Staff members subjected Plaintiff to unnecessary humiliation—such as repeated suicide-watch placements and exposure to media coverage of her case—actions that appear to have been encouraged or condoned by higher authorities. When correctional personnel implement or perpetuate punitive treatment of a detainee based on directives or sentiments from prosecutorial officials, their conduct becomes part of an orchestrated deprivation of substantive due process rights.

38

65. **Conscience-Shocking Standard**:

Taken individually and collectively, the conduct described above was wholly divorced from legitimate governmental objectives. There was no lawful purpose for misrepresenting Plaintiff's medical capacity, orchestrating a public spectacle with symbolic restraints, urging an excessive bond on improper grounds, or directing punitive confinement measures. These acts were driven by personal or political motives rather than by law-enforcement necessity. Conduct undertaken for such retaliatory or vindictive purposes "shocks the conscience" and constitutes a violation of the Fourteenth Amendment's substantive due process guarantee.

66. **Harm**:

As a result of the foregoing violations, Plaintiff suffered severe emotional and psychological harm, humiliation, and distress. The retaliatory and degrading actions caused lasting trauma, fear, and loss of confidence in the fairness of governmental institutions. The punitive jail measures imposed without justification also caused physical discomfort and anxiety. These injuries are distinct from and independent of any lawful sentence imposed by the court.

67. **Relief Requested**:

Defendants acted intentionally or with reckless disregard for Plaintiff's clearly established constitutional rights. Plaintiff seeks compensatory damages for emotional distress, reputational injury, and loss of liberty interests resulting from Defendants' arbitrary and retaliatory actions; punitive damages to deter similar misconduct by officials acting under color of law; and declaratory and injunctive relief recognizing that the conduct described herein— including symbolic public shaming, arbitrary bail advocacy, and retaliatory confinement measures— violated the Fourteenth Amendment's substantive due process protections.

**COUNT IV – 42 U.S.C. § 1983 – Unconstitutional Conditions of Confinement &
Cruel Treatment**

**(Against Williamson County Jail Officers and Staff: Nurse "Linda" and Doe
Officers)**

**68.** As a separate cause of action—related to but distinct from Count I—Plaintiff alleges

that the overall conditions of confinement and treatment she experienced at the Williamson

County Jail (from June 22 to July 6, 2020, and again in February 2022) violated her

constitutional rights. During her pretrial detention, these claims arise under the Fourteenth

Amendment's Due Process Clause. *See Bell v. Wolfish*, 441 U.S. 520 (1979). For her post-

conviction detention, they are governed by the Eighth Amendment's prohibition against cruel

and unusual punishment. *See Wilson v. Seiter*, 501 U.S. 294, 297–98 (1991). Jail conditions that

are not reasonably related to legitimate government objectives—or that are excessive in relation

to such objectives—are unconstitutional. Likewise, a failure to provide for basic human needs

such as hygiene, medical care, or safety can violate the Eighth Amendment when combined with

deliberate indifference.

**69. Suicide Watch Abuse:** Plaintiff was twice placed on suicide watch without clinical

justification—once in 2020 during intake and again in 2022 after her conviction. In both cases,

Plaintiff was cooperative and made no statements suggesting self-harm. Nevertheless, she was

stripped of her clothing, placed in a restrictive "turtle suit," and denied basic hygiene items and

comfort. At least one instance of suicide watch was imposed explicitly on the order of an

external official, not jail medical personnel. The unnecessary use of suicide watch is inherently

dehumanizing and, when not medically warranted, serves no legitimate penological purpose. *See*

*Blackmon v. Garza*, 484 F. App'x 866, 873 (5th Cir. 2012). The imposition of such conditions—

40

especially when repeated—violated Plaintiff's right to be free from punitive and arbitrary treatment as a detainee, and from cruel and disproportionate treatment as a convicted individual. *See Hudson v. McMillian*, 503 U.S. 1, 6 (1992).

**70. Unsanitary and Inhumane Cell Conditions:**

Plaintiff's initial cell was unsanitary, lacking clean bedding, with feces on the toilet and no access to soap, feminine hygiene products, or basic cleaning supplies. She was permitted only three showers during a 14-day period despite open wounds and menstruation. The Sixth Circuit and other courts have held that prolonged exposure to such conditions—particularly where there is a risk of infection or injury—violates basic standards of human dignity. *See Taylor v. Larson*, 505 F. App'x 475, 477 (6th Cir. 2012); *Despain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001). Jail officials were aware of Plaintiff's injuries and failed to take any steps to mitigate the risks presented by these unsanitary conditions.

**71. Deliberate Denial of Basic Comfort and Nutrition:**

During her initial incarceration, Plaintiff was denied even the most minimal humane accommodations. She was provided no pillow, sheets, or blanket and was forced to sleep directly on a cold metal bunk while wearing only a thin, abrasive "turtle suit" without padding or closure. The cell was kept at low temperatures, leaving her shivering and in constant pain from her fractured arm, crushed foot, rib fractures, and other injuries. She was denied any means to elevate her injured leg as ordered by her physicians. Despite her limited mobility, officers refused to assist with simple tasks such as delivering meals, opening containers, or helping her transfer to the toilet. The filthy conditions—including an uncleaned cell, a toilet encrusted with feces, and lack of basic hygiene items like soap or a toothbrush—compounded her suffering and humiliation. These cumulative deprivations deprived Plaintiff of sleep, warmth, nourishment,

41

and dignity, and served no legitimate penological purpose. The Constitution does not require jails to be comfortable, but it forbids the wanton infliction of pain and the denial of life's basic necessities. *See Rhodes v. Chapman,* 452 U.S. 337, 347 (1981). When considered together, the conditions imposed on Plaintiff amounted to cruel and unconstitutional treatment in violation of the Eighth and Fourteenth Amendments.

72.　　During her **first incarceration in June 2020**, which coincided with the funeral and public memorial events for the deceased officer, jail officials allowed continuous television broadcasts portraying Plaintiff as guilty and broadcasting motorcades honoring the officer. During her second incarceration in February 2022, following her trial, similar media coverage of the proceedings was aired within the jail. By permitting the continuous broadcast of this prejudicial coverage, officials fostered an environment of intimidation, hostility, and humiliation serving no legitimate security or rehabilitative purpose, thereby violating Plaintiff's Fourteenth Amendment right to humane, non-punitive conditions of confinement.

### 73. Excessive Demands Despite Injuries:

Jail staff routinely required Plaintiff to stand or move during headcounts and other procedures despite being aware of her physical condition. These requirements served no legitimate security purpose and were unnecessary given Plaintiff's medical restrictions. When correctional officers impose needless physical demands on an injured detainee for the purpose of asserting control or inducing discomfort, such actions may violate the Fourteenth or Eighth Amendments, depending on custody status.

### 74. Causation of Injury:

As a result of the unconstitutional conditions of her confinement, Plaintiff sustained serious and lasting injuries. Her injured foot worsened due to improper footwear and overuse; her hip wounds were reopened by ill-fitting clothing; she experienced periods of hunger and dehydration due to lack of assistance with meals; and she suffered at least one panic or respiratory episode related to stress and environmental conditions. These injuries were not speculative—they were directly caused or aggravated by the jail's failure to meet basic standards of care and humane treatment. In addition to physical pain, Plaintiff suffered emotional trauma, anxiety, and long-term psychological distress, all of which are compensable under § 1983.

### 75. Monell Allegation (if applicable):

To the extent necessary, Plaintiff alleges that the conditions and mistreatment described in this Count were the result of unconstitutional customs, practices, or policies of the Williamson County Sheriff's Office. These may include: (1) a de facto policy of placing high-profile detainees on suicide watch without medical justification; (2) a custom of denying adequate sanitation and hygiene items; and (3) a failure to train or supervise jail staff in how to handle detainees with serious injuries. *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989). These policies and practices contributed to the constitutional violations at issue. Plaintiff reserves the right to seek leave to add Williamson County as a defendant to assert municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

### 76. Relief Requested:

Defendants subjected Plaintiff to conditions and treatment that were punitive, degrading, and unnecessary, thereby violating her constitutional rights. Plaintiff seeks:

- Compensatory damages for the physical, psychological, and emotional harm she endured;

43

- Punitive damages against individual staff members who acted with deliberate indifference or reckless disregard for her well-being; and

- Injunctive relief to require Williamson County Jail to implement policies that (a) prohibit the misuse of suicide watch, (b) ensure access to basic hygiene and sanitation, and (c) require humane treatment and medical accommodations for injured detainees.

**PRAYER FOR RELIEF**

**WHEREFORE, Plaintiff Ashley Kroese respectfully requests that this Court grant the following relief:**

**a. Declaratory Relief:**

A judgment declaring that the actions and omissions of Defendants violated Plaintiff's rights under the United States Constitution, including:

- Her Fourth Amendment right to be free from unreasonable searches and seizures, including the seizure of medical specimens without consent or proper judicial execution;

- Her Fourteenth Amendment rights as a pretrial detainee to adequate medical care, humane conditions of confinement, and protection from arbitrary or punitive treatment not related to legitimate governmental purposes; and

- Her Eighth Amendment right to be free from cruel and unusual punishment during her post-conviction confinement.

**b. Injunctive Relief:**

Appropriate injunctive orders requiring that Defendants, their successors, or associated agencies implement constitutional policies and procedures, including:

- Prohibiting Vanderbilt University Medical Center staff from releasing patients to law enforcement custody against medical advice or without ensuring appropriate medical

44

continuity of care, and requiring informed consent or valid warrant procedures for the release of medical samples to law enforcement;

- Requiring the Tennessee Highway Patrol and Williamson County Sheriff's Office to train personnel in lawful evidence handling, detainee medical accommodation, and appropriate use of suicide watch measures;

- Enjoining Williamson County Jail from imposing punitive or medically unnecessary conditions (including suicide watch, unsanitary confinement, or denial of hygiene) on detainees;

- Prohibiting the District Attorney's Office (21st Judicial District) from directing jail conditions or engaging in symbolic acts of punishment against detainees that serve no security or legal function;

- Requiring protocols to ensure that any future biological evidence seized for law enforcement purposes complies with constitutional safeguards, including clear medical chain-of-custody standards.

**c. Compensatory Damages:**

An award of compensatory damages, jointly and severally, against Defendants in an amount to be determined at trial, for:

- Plaintiff's physical injuries;

- Prolonged pain and suffering;

- Emotional distress;

- Medical complications resulting from denial of treatment and accommodations; and

- Psychological trauma and humiliation caused by unconstitutional confinement conditions and retaliatory treatment.

45

**d. Punitive Damages:**

An award of punitive damages against individual Defendants whose actions were willful,

malicious, or recklessly indifferent to Plaintiff's constitutional rights—including but not limited

to retaliatory and conscience-shocking conduct carried out by prosecutorial and jail officials.

**e. Attorneys' Fees and Costs:**

An award of reasonable attorneys' fees and litigation expenses under 42 U.S.C. § 1988 and any

other applicable provision.

**f. Further Relief:**

Any additional relief the Court deems just and proper, including but not limited to the

prospective appointment of an independent monitor to ensure compliance with any injunctive

orders, if warranted by the evidence.

**JURY DEMAND:**

Plaintiff hereby demands a trial by jury on all issues so triable.

**DECLARATION UNDER PENALTY OF PERJURY**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge, information, and belief.

Executed on _27 Oct 25_ [date].

Respectfully submitted,

_Ashley Kroese_

Plaintiff Ashley Kroese, pro se
TOMIS ID: 00638047
Debra K. Johnson Rehabilitation Center
3881 Stewarts Lane
Nashville, TN 37243

46

***Sources***

- Vanderbilt Hospital records and family statements detailing Plaintiff's treatment and premature discharge.

- Williamson County Jail records and Plaintiff's own account of jail conditions (June–July 2020).

- Transcript of suppression hearing and trial (State v. Kroese) showing Trooper Priest's testimony about Plaintiff's incapacity and chain-of-custody gaps.

- Dash cam footage transcript (Trooper Nieuwenhuis's vehicle) revealing officers' on-scene statements about lack of evidence and warrant strategy.

- Tennessee Court of Criminal Appeals opinion (2024) summarizing facts of blood draw and warrant issues.

- Expert analysis of blood evidence irregularities (photo metadata, Fentanyl anomaly, chain-of-custody contradictions).

- News reports on bond hearing quoting DA Helper on flight risk and bond amount.

- Plaintiff's affidavits regarding post-verdict treatment (use of Legieza's handcuffs, second suicide watch).

*The above sources corroborate the factual allegations in this Complaint.*