UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| ASHLEY BIANCA RUTH KROESE, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 3:25-cv-01268 |
| WILLIAMSON COUNTY, TENNESSEE, *et al.*, | ) | JUDGE RICHARDSON |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Ashley Bianca Ruth Kroese, an inmate of the Debra K. Johnson Rehabilitation Center in Nashville, Tennessee, has filed a pro se Complaint under 42 U.S.C. § 1983, alleging violations of her civil rights. (Doc. No. 1). The Complaint names 14 Defendants.[1] The Complaint is before the Court for initial review pursuant to 28 U.S.C. § 1915A. Also before the Court are several motions that will be resolved in this Order.

## I. Motions to Drop Defendants

Plaintiff has filed a Notice of Voluntary Dismissal Without Prejudice as to Defendant Kim Helper (Doc. No. 22) and a Notice of Voluntary Dismissal as to Defendant Judge Thomas Taylor, Jr. (Doc. No. 23).

[1] (1) Williamson County, Tennessee; (2) District Attorney Kim R. Helper; (3) Assistant District Attorney Jamie Pulido; (4) Trooper Matthew Priest; (5) Trooper Ryan Nieuwenhuis; (6) Leesa Gant; (7) Vanderbilt University Medical Center (TK Health); (8) "Williamson County Sheriff's Office / Jail Division and Medical Staff"; (9) Judge Tom Taylor; (10) Allie Osborne, R.N.; (11) Nurse Chandler; (12) Nurse Linda; (13) John / Jane Doe Vanderbilt Hospital Staff (Legal and Lab Personnel); and (14) "John / Jane Doe Williamson County Jail Officers and Medical Staff." (Doc. No. 1 at 2−3, 12−13). The Court construes "Williamson County Sheriff's Office / Jail Division and Medical Staff" and "John / Jane Doe Williamson County Jail Officers and Medical Staff" to refer to the same set of unidentified medical and custody staff members at the Williamson County Jail.

"On motion or on its own, the court may at any time, on just terms, add or drop a party." Fed. R. Civ. P. 21.[2] Because a plaintiff's notice of voluntary dismissal—which is a device prescribed by Rule 41(a)(1)(A)(i)—has generally been treated in the Sixth Circuit as a device solely for dismissing an entire action (all claims against *all* defendants), the Court construes the Notices as motions to drop Defendants Kim Helper and Judge Thomas Taylor, Jr. pursuant to Rule 21, and the Court must make an independent determination that dropping each party is appropriate. Here, the Court has little difficulty concluding that the interests of justice support dropping the parties as requested, given that Defendant Kim Helper is now deceased (Doc. No. 22 at 1), and given its potential for increasing judicial efficiency in resolving this dispute and the apparent lack of objection to it. Plaintiff's motions to drop defendants (Doc. Nos. 22, 23) will be granted, and Defendants Kim Helper and Judge Thomas Taylor, Jr. will be dismissed without prejudice as Defendants in this case. Judge Taylor's Motion to Dismiss (Doc. No. 7) will be denied as moot.

## II. Motion for Screening

Defendants Leesa Gant, Ryan Nieuwenhuis, and Matthew Priest have filed a motion requesting that the Court screen Plaintiff's Complaint under the Prison Litigation Reform Act. (Doc. No. 19). That motion will be granted, and the Court will screen the Complaint below.

## III. Screening the Complaint

The Complaint is before the Court for an initial review pursuant to the Prison Litigation Reform Act ("PLRA"), 28 U.S.C. § 1915A.

[2] The Notice of Dismissal as to Defendant Helper does not cite any authority (Doc. No. 22), and the Notice of Dismissal as to Defendant Judge Taylor relies on Rule 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure (Doc. No. 23 at 1). However, as indicated above, district courts within the Sixth Circuit routinely apply Rule 21, as opposed to Rule 41, when dismissing fewer than all defendants or claims. *United States ex rel. Doe v. Preferred Care, Inc.*, 326 F.R.D. 462, 464 (E.D. Ky. 2018) (citing cases).

### A. PLRA Screening Standard

The Court must dismiss a complaint or any portion of a complaint filed by an incarcerated person that fails to state a claim upon which relief can be granted, is frivolous, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(a), (b).

The Court must construe the pro se Complaint liberally, *United States v. Smotherman*, 838 F.3d 736, 739 (6th Cir. 2016), and accept Plaintiff's factual allegations as true unless they are entirely without credibility. *See Thomas v. Eby*, 481 F.3d 434, 437 (6th Cir. 2007). Although pro se pleadings are to be held to a less stringent standard than formal pleadings drafted by lawyers, *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972), the Court's "duty to be 'less stringent' with pro se complaints does not require us to conjure up [unpleaded] allegations." *McDonald v. Hall*, 610 F.2d 16, 19 (1st Cir. 1979) (citation omitted).

### B. Factual Allegations

In accordance with the standards above, the Court presents Plaintiff's factual allegations as alleged in the Complaint, without making any finding regarding the truth of the allegations. The facts alleged in the complaint as stated below are accepted as true for purposes of the current screening.

Plaintiff sustained severe injuries from an automobile collision that resulted in the death of Brentwood Police Officer Destin Legieza on June 18, 2020. (Doc. No. 1-1 at 6). Plaintiff was taken to Vanderbilt University Medical Center for treatment of her injuries, which included a fractured arm, a crushed foot, a dislocated toe, several rib fractures, a collapsed lung, a subarachnoid brain hemorrhage, and other internal injuries. (*Id.* at 6–7). She was admitted to the Intensive Care Unit. (*Id.* at 7).

Defendant Trooper Matthew Priest asked Plaintiff questions while undergoing treatment in the emergency room. (*Id.*) Plaintiff states that, although she was medicated and in pain, she was able to communicate coherently. (*Id.*)

Plaintiff was administered opioid medication, as well as Fentanyl, beginning at 5:38 a.m. on June 18, 2020, before she arrived at the hospital. (*Id.*) Plaintiff contends that none of the police officers, EMTs, or hospital personnel reported any visible signs of intoxication, and no odor of alcohol was documented at the scene. (*Id.*) Hospital staff drew Plaintiff's blood as part of routine trauma care, and lab results did not reflect the presence of Fentanyl despite its administration prior to the blood draw. (*Id.*)

Law enforcement sought a search warrant for Plaintiff's blood. (*Id.* at 8). Assistant District Attorney Jamie Pulido advised law enforcement to proceed with a warrant even if Plaintiff would possibly consent. (*Id.*) Law enforcement obtained four vials of blood that had been drawn by hospital staff several hours earlier. (*Id.*) Plaintiff contends that the vials had already been "accessed, manipulated, and tested for clinical purposes" before being place in law enforcement's custody, and no written consent was obtained from Plaintiff or her healthcare proxy prior to the release of her blood samples. (*Id.*)

Trooper Priest and Trooper Ryan Nieuwenhuis obtained the blood vials from hospital staff and placed them into a Tennessee Bureau of Investigation evidence kit outside of the hospital. (*Id.* at 8). At a suppression hearing, Troopers Priest and Nieuwenhuis testified that they went to the Davidson County Courthouse before taking the evidence to the Tennessee Bureau of Investigation. (*Id.* at 8). Trooper Nieuwenhuis stated he kept the blood vials in his patrol car while Trooper Priest went to the courthouse separately, but Computer-Aided Dispatch records demonstrate that Defendant Priest went to the crash scene shortly after leaving the hospital. (*Id.* at 8–9). Plaintiff contends that this violated forensic evidence-handling protocols, creating a significant risk of contamination, degradation, or loss of evidentiary integrity. (*Id.* at 9). "Official statements and testimony regarding the chain of custody for the blood samples contained discrepancies." (*Id.*)

There has been no identification provided of the person who performed the blood draw. (*Id.* at 9). There are further chain-of-custody and documentation issues regarding the blood vials, reflecting the lack of compliance with evidence-handling practices. (*Id.*)

During Plaintiff's admission to Vanderbilt University Medical Center from June 18, 2020 to June 21, 2020, hospital staff initially restricted parental access because of hospital policy and law enforcement involvement. (*Id.* at 10). Plaintiff's family members received limited information, which was often communicated informally or in handwritten notes. (*Id.*) Plaintiff contends that this caused distress and limited Plaintiff's family's ability to advocate for her medical needs. (*Id.*)

Also during her hospitalization, Plaintiff was subjected to harsh and dismissive treatment, experienced delays in receiving pain medication, was left on a bedpan for an extended period without assistance, and family members had to intervene to secure timely care. (*Id.*) This, per Plaintiff, indicates a possible bias due to the nature of the incident at issue. (*Id.*) Plaintiff's father requested a comprehensive toxicology screening be done on Plaintiff while hospitalized, but hospital staff refused. (*Id.*) Plaintiff alleges that various medical decisions were influenced by the "presence and priorities" of law enforcement personnel. (*Id.*)

Plaintiff was placed under arrest on June 21, 2020, while still hospitalized. (*Id.*) Despite hospital staff's indication that Plaintiff required a minimum of two more weeks of inpatient care, law enforcement planned to transfer her to jail on June 22, 2020. (*Id.* at 10−11). "[D]ischarge planning was deferred to law enforcement preferences." (*Id.* at 11).

Plaintiff was discharged from the hospital on June 22, 2020 and placed into police custody. (*Id.*) Dr. Oliver Lee Gunter, Jr., the supervising physician, signed off on the discharge at 9:21 p.m. (*Id.*) When released, Plaintiff remained in a wheelchair with orthopedic braces and unresolved pulmonary injuries. (*Id.*) There was no implementation of a coordinated discharge plan "to ensure continuity of care or to provide appropriate medical accommodations in custody." (*Id.*)

Plaintiff received minimal follow-up care following her transfer from the hospital. (*Id.*) Plaintiff's treatment was discontinued, and jail medical personnel failed to continue the care plan prescribed by treatment providers. (*Id.*)

Plaintiff arrived at the Williamson County Jail on June 22, 2020. (*Id.*) Upon her arrival, jail staff immediately placed Plaintiff on "suicide watch" status after she reported to a nurse during a mental health screening that she was "shocked." (*Id.* at 12). Plaintiff was stripped of her clothing and given a "turtle suit" to wear, which is an article of clothing intended to prevent self-harm. (*Id.*) The jail failed to provide all equipment required for an inmate under suicide watch, including a padded cover or proper fasteners for the smock. (*Id.*) As a result, Plaintiff was left "exposed and cold as the Velcro on the suit would not stay secured." (*Id.*)

Plaintiff was required to quarantine in a lockdown intake pod upon her initial incarceration. (*Id.*) Plaintiff maintains the cell was "filthy and ill-suited for a medically vulnerable person." (*Id.*) The bed was a dirty metal slab, and the toilet was encrusted with feces. (*Id.*) As a result of her being on suicide watch, Plaintiff was not allowed any linens or any sort of padding, so she was forced to lie directly on the cold metal slab. (*Id.*)

Hospital physicians had opined that Plaintiff's leg must remain elevated, but the jail officer mocked Plaintiff when she reported this medical directive. (*Id.*) Plaintiff was assigned a wheelchair, but no one was assigned to help her get around or use the bathroom, and Plaintiff was limited as one arm was immobilized in a cast and sling, one foot was in a cast, and the other foot was severely bruised. (*Id.* at 13). Plaintiff was eventually given a "plastic bedside commode frame with armrests to place over the toilet," but it was "filthy [and] caked with excrement upon issue." (*Id.*)

Jail staff refused to provide Plaintiff's prescribed pain medication and other medically indicated therapies. (*Id.*) On Plaintiff's first day in custody, Nurse Linda refused to give Plaintiff the medication she was prescribed, saying, "This is a jail not a hospital." (*Id.*) Nurse Linda further stated

that whether or not pain medication would be provided would be left to each nurse's discretion. (*Id.*) Plaintiff was often denied pain medication over the two weeks she remained incarcerated, and she endured excruciating pain as a result. (*Id.*) Plaintiff was also inconsistently provided her anticoagulant, which was meant to prevent blood clots. (*Id.* at 14).

Plaintiff was also deprived by jail personnel of her medical equipment, such as her post-operative "surgical shoe," which was thrown away by jail staff upon her intake. (*Id.*)

Plaintiff was eventually taken off suicide watch and given an orange jumpsuit to wear. (*Id.*). Because the jumpsuit was one size too small, it rubbed on Plaintiff's raw, abraded skin from the accident, which then caused further bleeding and pain. (*Id.*) The undergarments she was given were also ill fitting and caused chafing on her injuries. (*Id.*)

Shortly after being taken off suicide watch, Plaintiff was not given adequate feminine hygiene products once she began menstruating, which left her to bleed on herself for hours before she received sanitary pads. (*Id.*) Plaintiff required assistance to clean herself properly due to her injuries, but that assistance was not provided. (*Id.*) Plaintiff requested but did not receive a shower after soiling her clothes. (*Id.*).

Plaintiff was allowed to shower (only) three times in fourteen days despite her requests to bathe more frequently. (*Id.* at 15). Jail officers often told her "no" or gave her excuses such as not having an available female officer. (*Id.*) Plaintiff's inability to properly clean herself caused her distress and the risk of infecting her wounds. (*Id.* at 16).

During the daily roll call of inmates, most guards forced Plaintiff to either sit up or stand at the cell door for count, despite Plaintiff's broken ribs and difficulty moving. (*Id.*) Officers often refused to bring Plaintiff's food tray to her bunk at mealtimes and required her to shuffle to her cell door to retrieve it. (*Id.*) Officers also refused to assist in opening containers that required the use of both hands, leaving Plaintiff unable to eat or drink parts of her meal. (*Id.*)

Plaintiff was given a breathing treatment device in the hospital that helped re-expand and exercise her collapsed lung to prevent pneumonia. (*Id.*) The jail confiscated and/or failed to provide the device upon Plaintiff's arrival. (*Id.*) Plaintiff repeatedly asked for it because it was prescribed for her recovery, and it took jail personnel several days to give it to her. (*Id.*) Plaintiff's breathing became shallow and painful while she waited to be given the device, and the severe breathing difficulty—a possible sign of incomplete lung expansion or mucus buildup—resulted in her gasping and finally being given the required device. (*Id.* at 16−17).

Jail staff made demeaning and retaliatory comments towards or about Plaintiff during her incarceration. (*Id.* at 17). Plaintiff heard jail staff say "cruel things about her situation." (*Id.*) News segments about Plaintiff's case were played in the jail's common area televisions; likewise, coverage of Officer Legieza's funeral motorcade was shown at the jail. (*Id.*) This was done even though "[t]ypically, jails avoid showing inmates news about their own cases, especially in a way that could incite harassment or violence." (*Id.*) Plaintiff felt that the broadcast of her case was done to shame and psychologically punish her, and she feared for her safety. (*Id.*)

Upon Plaintiff's return to Williamson County jail after her convictions, she was again evaluated by intake staff and expressed that she had no suicidal ideation or intent of self-harm. (*Id.* at 21). Plaintiff was cleared for a standard housing assignment and issued a standard uniform. (*Id.*) Shortly thereafter, Plaintiff was placed on suicide watch despite the evaluation, while being told that the decision came from "the city attorney." (*Id.*) Plaintiff contends that "[j]ail records and staff statements suggested that this directive originated outside the jail's medical chain of command and contradicted the initial screening determination." (*Id.*) Plaintiff was kept on suicide watch for several days "despite the absence of any clinical basis for suicide watch.," and she was denied hygiene items. (*Id.*) Following several days of being on suicide watch, Plaintiff was reevaluated, and it was "confirmed there was no justification for the designation." (*Id.* at 21). Plaintiff was then taken off

suicide watch, but she was for several days kept in "protective custody," a form of isolated confinement. (*Id.* at 21−22). Plaintiff contends that her placement on suicide watch and in protective custody was punitive and retaliatory. (*Id.* at 22).

Plaintiff's first days of incarceration after conviction in "extreme discomfort and degradation," was provided "no pillow, no blanket (at first), no clothing besides the abrasive smock, and no hygiene items whatsoever," and she "was given only a few pieces of toilet paper at a time, 'on demand,' after begging for it. (*Id.*)

### C. Claims to Proceed

Plaintiff asserts that the actions of Nurse Linda and unnamed Williamson County Jail medical and staff members constituted deliberate indifference to her well-being in violation of the Eighth and Fourteenth Amendments.[3] To state a viable conditions-of-confinement claim under the Eighth Amendment or Fourteenth Amendment, Plaintiff must allege facts from which the Court may reasonably infer that "there [was] a substantial risk of serious harm the state knew about and disregarded." *Poynter by and through Fernandez v. Shirley*, --- F.4th ---, ---, 2026 WL 2641092, at *6−7 (6th Cir. Sept. 8, 2026) (en banc) (quotation marks omitted) (applying the "subjective-

---

[3] Plaintiff's allegations cover both time when she was a pretrial detainee and time when she was a convicted inmate. As discussed more fulsomely in the following two paragraphs, the Fourteenth Amendment applies to her claims arising out of the former time period, and the Eighth Amendment applies to her claims arising out of the latter time period. *See Kingsley v. Hendrickson*, 576 U.S. 389, 400 (2015).

The Eighth Amendment protects inmates serving sentences of imprisonment after conviction. *See Richmond v. Huq,* 885 F.3d 928, 937 (6th Cir. 2018) ("The Eighth Amendment provides an inmate the right to be free from cruel and unusual punishment."). In the case of state (as opposed to federal) officers, Eighth Amendment protections are applicable (when they are applicable) specifically by way of the Fourteenth Amendment. *See Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021). In these situations, courts generally speak in terms of "Eighth Amendment" protection without any reference (beyond an initial reference) to the Fourteenth Amendment.

By contrast, the Due Process Clause of the Fourteenth Amendment provides the same kind (though not always identical) protection to pretrial detainees. *Richmond*, 885 F.3d at 937 ("The Due Process Clause of the Fourteenth Amendment provides the same protections to pretrial detainees."). Such protection is generally referred to by courts as "Fourteenth Amendment" protection without any reference (beyond an initial reference) to the Due Process Clause.

knowledge requirement" set forth in *Farmer v. Brennan*, 511 U.S. 825 (1994), to Fourteenth Amendment conditions-of-confinement claims just it has long been applied to Eighth Amendment conditions-of-confinement claims). Here, Plaintiff alleges that Nurse Linda denied her pain medication that had been prescribed by Vanderbilt University Medical Center staff. (Doc. No. 1-1 at 13). Nurse Linda and other Williamson County Jail staff subjected her to suicide watch despite no medial need. (*Id.* at 22). The conditions included no pillow, no clothing other than a smock, no hygiene items, and some amount of time with no blanket. (*Id.*) Staff observed her pain and difficulty breathing but denied requests for assistance. (*Id.* at 16−17). And staff provided food to her in containers that she could not open, thereby denying her full meals. (*Id.* at 16). Based on these and other allegations, Plaintiff has alleged sufficient facts to state Eighth and Fourteenth Amendment claims against Nurse Linda and unnamed Williamson County Jail staff.

Plaintiff also asserts that Williamson County is liable for jail staff's misconduct. "A plaintiff raising a municipal liability claim under § 1983 must demonstrate that the alleged federal violation occurred because of a municipal policy or custom." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). There are "at least four avenues a plaintiff may take to prove the existence of a municipality's illegal policy or custom," including "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). Here, Plaintiff alleges that she faced unconstitutional conditions of confinement as a result of Williamson County's "(1) [] de facto policy of placing high-profile detainees on suicide watch without medical justification; (2) [] custom of denying adequate sanitation and hygiene items; and (3) [] failure to train

or supervise jail staff in how to handle detainees with serious injuries."[4] (Doc. No. 1-1 at 43). Based on these allegations, she has alleged viable Eighth and Fourteenth Amendment claims against Williamson County. These claims shall proceed.

**D. Claims to Be Dismissed**

Plaintiff's remaining claims will be dismissed for failure to state a claim upon which relief may be granted. The Court will address the remaining claims below, categorized by individual Defendants or groups of Defendants, depending on the allegations underlying the claims and the bases for dismissal.

*1. Leesa Gant*

The Complaint names Leesa Gant as a Defendant but does not include any allegations regarding her conduct or involvement in any constitutional violation. The Court therefore may not reasonably infer that Ms. Gant is liable under Section 1983 (or any other theory of liability). Accordingly, all claims against Ms. Gant will be dismissed for failure to state a claim upon which relief may be granted.

*2. Nurse Osborne, Nurse Chandler, Vanderbilt University Medical Center, and Unidentified Vanderbilt University Medical Center Staff*

Plaintiff's claims against Nurse Osborne, Nurse Chandler, Vanderbilt University Medical Center, and "John / Jane Doe Vanderbilt Hospital Staff" will be dismissed for failure to state a claim upon which relief may be granted.

To state a viable Section 1983 claim, a plaintiff must allege that the relevant defendant "acted under color of state law." *Rudd v. City of Norton Shores, Mich.*, 977 F.3d 503, 512 (6th Cir. 2020) (quotation marks omitted). Plaintiff acknowledges that Nurse Osborne, Nurse Chandler, and other Vanderbilt University Medical Center staff members are individuals who worked for a privately

[4] These allegations are arguably conclusory and unsupported by specific factual allegations. At this early stage of proceedings, however, the Court accepts the allegations as factual.

owned entity, and thus ordinarily would not act under color of state law. (*See* Doc. No. 1-1 at 5). However, Plaintiff assets that these Defendants "are sued under § 1983 for willfully participating in, and conspiring with, state officials to deprive Plaintiff of her rights (e.g., acceding to law enforcement pressure to deny care or seize evidence without consent)." (*Id.*)

"[C]laims of conspiracies between private and state actors, if adequately alleged, generally suffice to establish state action on the part of the private actors for the purpose of deciding a motion to dismiss." *Rudd*, 977 F.3d 503, 512. To adequately plead a conspiracy, a plaintiff must allege facts from which the Court may reasonably infer that "a single plan existed, that each alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy." *Id.* (quotation marks omitted).

Here, the Complaint alleges that Nurse Osborne, Nurse Chandler, and other Vanderbilt University Medical Center staff members failed to provide appropriate medical care to Plaintiff and authorized her hospital discharge before it was medically appropriate. (Doc. No. 1-1 at 25). However, the Complaint neither identifies any conspiratorial objective underlying these actions, nor alleges any facts suggesting that these Defendants shared in that conspiratorial objective. The Complaint therefore fails to allege facts from which the Court may reasonably infer that Nurse Osborne, Nurse Chandler, or other Vanderbilt University Medical Center staff members were engaged in a conspiracy with law enforcement officials such that they acted under color of state law and would be potentially liable under Section 1983. Accordingly, Plaintiff's claims against Nurse Osborne, Nurse Chandler, Vanderbilt University Medical Center,[5] and Vanderbilt University Medical Center staff members will be dismissed for failure to state a claim upon which relief may be granted.

[5] Plaintiff's claims against Vanderbilt University Medical Center are also subject to dismissal for another, independent reason. "[A] plaintiff bringing a § 1983 suit against a private company must prove that his constitutional rights were violated and that the company's policy or custom was the moving force behind the violation." *Warman v. Mount St. Joseph Univ.*, 144 F.4th 880, 891 n.4 (6th Cir. 2025) (quotation marks and

*3. Trooper Priest, Trooper Nieuwenheis, and Assistant District Attorney Pulido*

Plaintiff's claims against Trooper Priest, Trooper Nieuwenheis, and Assistant District Attorney Pulido will be dismissed under the principles set forth in *Heck v. Humphrey*.

> [T]o recover damages for allegedly unconstitutional conviction or imprisonment, **or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid**, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.

512 U.S. 477, 486−87 (1994) (emphasis added). Where a convicted plaintiff's claim rests on the assertion that material evidence introduced at trial was collected in violation of the Fourth Amendment, *Heck* applies and bars the claim if the conviction(s) remains() intact. *West v. Saginaw Twp. Police Dep't*, No. 16-2377, 2017 WL 4513184, at *2 (6th Cir. Sept. 5, 2017) ("Because [the plaintiff's] convictions have not been overturned, expunged, declared invalid, or called into question on habeas review, and because judgment in his favor on these issues would necessarily imply the invalidity of his convictions, these Fourth Amendment claims are not cognizable under § 1983.").

Here, Plaintiff alleges that Trooper Priest, Trooper Nieuwenheis, and Assistant District Attorney Pulido participated in seizing and processing several vials of her blood, which had been drawn at Vanderbilt University Medical Center for medical testing. (Doc. No. 1-1 at 7−10). Trooper Priest obtained the search warrant for the blood. (*Id.* at 8). In doing so, Trooper Priest represented that Plaintiff was non-responsive, when in fact she was able to communicate. (*Id.* at 7, 36). Assistant District Attorney Pulido advised law enforcement to seek the warrant, even if Plaintiff might have consented to the search without a warrant. (*Id.*) Troopers Priest and Nieuwenhuis obtained the blood vials and put them into an evidence kit. (*Id.*) Plaintiff alleges that the troopers failed to accurately document chain-of-custody procedures. (*Id.* at 8−9). Plaintiff contends that these actions violated her

---

ellipsis omitted). Here, Plaintiff makes no such allegations regarding the Vanderbilt University Medical Center, so she has failed to state a claim upon which relief may be granted as to this Defendant.

Fourth Amendment right against unreasonable search and seizure, as well as her Fourteenth Amendment right to substantive due process. (*Id.* at 31−36).

Plaintiff was convicted of vehicular homicide by intoxication, vehicular homicide with a blood alcohol concentration of 0.08% or greater, vehicular homicide by recklessness, and reckless aggravated assault resulting in death. *State v. Kroese*, No. M2022-01180-CCA-R3-CD, 2024 WL 2034366, at *1 (Tenn. Crim. App. May 7, 2024). Those convictions remain intact, not having been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.

The results of her blood test constituted key evidence in support of these convictions. *Id.* at *2. Accordingly, if Plaintiff were to succeed on her claims that the seizure or "search"—that is, the blood test itself—violated the Fourth Amendment or her right to due process, it would necessarily imply the invalidity of her convictions. These claims will therefore be dismissed under *Heck*.

## IV. Motions to Dismiss and Plaintiff's Motion Related to One of Them

Defendants' Motions to Dismiss (Doc. Nos. 7, 9, 11, and 16) each will be denied without prejudice. Three of those of four motions (Doc. Nos. 7, 11, and 16) are denied as moot (which amounts technically to a denial without prejudice) because they were filed by Defendants who are herein dismissed. As for the other motion (Doc. No. 9), it was filed by Williamson County and is being denied without prejudice to Williamson County filing another motion to dismiss after having had an opportunity to review and take into account the instant order.

Plaintiff's Motion to File Supplemental Declaration in Opposition to Defendant Williamson County's Motion to Dismiss (Doc. No. 33) will be denied as moot.

## V. Conclusion

Plaintiff's Notice of Voluntary Dismissal Without Prejudice as to Defendant Kim Helper (Doc. No. 22) and Notice of Voluntary Dismissal as to Defendant Judge Thomas Taylor, Jr. (Doc. No. 23) are **GRANTED**. All claims against Defendants Kim Helper and Judge Thomas Taylor, Jr. are **DISMISSED** without prejudice.

Defendants' Motions to Dismiss (Doc. Nos. 7, 9, 11, and 16) are **DENIED** without prejudice. Plaintiff's Motion to File Supplemental Declaration in Opposition to Defendant Williamson County's Motion to Dismiss (Doc. No. 33) is **DENIED** as moot.

Defendants Gant, Nieuwenhuis and Priest's Motion for § 1915A Screening (Doc. No. 19) is **GRANTED**.

The Court has reviewed the Complaint in accordance with 28 U.S.C. § 1915A.

Plaintiff's claims against Trooper Priest, Trooper Nieuwenheis, and Assistant District Attorney Pulido are **DISMISSED** under the principles set forth in *Heck*. Plaintiff's claims against Leesa Gant, Nurse Osborne, Nurse Chandler, Vanderbilt University Medical Center, and "John / Jane Doe Vanderbilt Hospital Staff" are **DISMISSED** for failure to state a claim upon which relief may be granted.

Plaintiff's Eighth and Fourteenth Amendment claims against Nurse Linda, unnamed Williamson County Jail medical and staff members, and Williamson County itself **SHALL PROCEED**. The Clerk **SHALL** terminate all other named Defendants on the docket.[6]

[6] Despite filing various defensive motions—namely various respective motions to dismiss (Doc. Nos. 7, 9, 11, and 16), Defendants have filed no objection to their joinder in this action. However, it appears some of them are improperly joined pursuant to Rule 20(a)(2) of the Federal Rules of Civil Procedure. Ordinarily, the Court would reject the Complaint and direct Plaintiff to file a Complaint that does not improperly join any Defendants. But given the procedural posture of this action, the Court has exercised its discretion to address all of Plaintiff's claims at screening. The claims that shall proceed in this action appear to be properly joined; that is, had the remaining claims and Defendants originally been joined in the complaint (without the dismissed claims and Defendants), it appears that such joinder would have been proper.

The Clerk is **DIRECTED** to send Plaintiff service packets (a blank summons (AO 440) and USM 285 form) for Defendants Nurse Linda, unnamed Williamson County Jail medical and staff members, and Williamson County. Plaintiff **MUST** complete the service packet and return it to the Clerk's Office within **30 DAYS** of the entry of this order. Failure to do so may result in the dismissal of this case. Upon return of the properly completed service packet, the Clerk is **DIRECTED** to issue summons to the U.S. Marshals Service for service on the Defendant. Fed. R. Civ. P. 4(b) and 4(c)(3).

Pursuant to 28 U.S.C. §§ 636(b)(1)(A) and (B), this action is **REFERRED** to the Magistrate Judge to enter a scheduling order for the management of the case, to dispose or recommend disposition of any pre-trial, non-dispositive motions, to issue a Report and Recommendation on all dispositive motions, and to conduct further proceedings, if necessary, under Rule 72(b), Fed. R. Civ. P., and the Local Rules of Court. Despite the issuance of process, the Magistrate Judge may *sua sponte* recommend the dismissal of any claim for the reasons set forth in 28 U.S.C. § 1915(e)(2).

Plaintiff is forewarned that this action may be dismissed if she fails to apprise the Court of any address changes.

IT IS SO ORDERED.

Eli Richardson
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE